UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELLE ELIZABETH
HAAS-HESKETT,

                   Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

                   Defendant.
_____/

Case No. 2:14-cv-12178

District Judge Denise Page Hood

Magistrate Judge Anthony P. Patti

## RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 14) AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 11)

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment (DE 14), **DENY** Plaintiff's motion for summary judgment (DE 11), and

**AFFIRM** the Commissioner's decision.

**II.**    **REPORT**

      Plaintiff, Michelle Elizabeth Haas-Heskett, brings this action under 42

U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her applications for

social security disability insurance benefits and supplemental security income.

This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 11), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 14), and the administrative record (DE 8).

### A.   Background

Plaintiff protectively filed her applications for benefits on July 27, 2011, alleging that she has been disabled since January 1, 2008, at age 29.  (R. at 149.) Plaintiff alleges disability as a result of bipolar disorder, anxiety disorder, irritable bowel syndrome, carpal tunnel, and migraines.  (Id.)  Plaintiff's applications were denied.  Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Paul W. Jones held a hearing on January 8, 2013 and subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 78-148.)   On April 21, 2014, the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.)  ALJ Jones' decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

### B.   Plaintiff's Medical History

Plaintiff has a history of both voluntary and involuntary hospitalizations related to her psychological problems.  Plaintiff was admitted to Providence Hospital on March 4, 2008 for evaluation of her "emotionally perturbed state."  (R. at 713.)  Plaintiff indicated that she was not in good control of her behavior and

2

had been "rough" with her infant son. (R. at 714.) She was discharged on March

11, 2008, at which time Anthony B. Michaels, D.O., described her as "outgoing,

extroverted, social, smiling broadly . . . quite verbal, active and quite lively," but

highly perfectionistic and anxious. (R. at 712.) Plaintiff was discharged because

she "felt she had accomplished what she needed to in the psychiatric day hospital."

(Id.)

Plaintiff presented to Sanjeev Venkataraman, M.D., on February 4, 2010, for

an initial visit. (R. at 376-77.) She was referred to Dr. Vankataraman for anxiety

and depression. Plaintiff also reported that she was having trouble sleeping.

According to Plaintiff, she was diagnosed with bipolar disorder at age 21 and had

two prior psychiatric hospitalizations, first in 2000 at the University of Michigan

(R. at 851-867), and again in March 2009 at Providence Hospital, as described

above. (R. at 377.) Dr. Venkataraman assessed Plaintiff as mildly hypomanic,

with a global assessment functioning score ("GAF") of 60.[1] Plaintiff saw Dr.

---

[1] The GAF scale was used to report a clinician's judgment of an individual's
overall level of functioning. Clinicians selected a specific GAF score within the
ten-point range by evaluating whether the individual was functioning at the higher
or lower end of the range. *See* American Psychiatric Ass'n, Diagnostic and
Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association,
4th ed. text rev. 2000) (DSM-IV-TR). A GAF score of 51-60 was indicative of
moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic
attacks) or moderate difficulty in social, occupational, or school functioning (e.g.,
few friends, conflicts with peers or co-workers). DSM-IV-TR at 34. However,
"the most recent version of the DSM does not include a GAF rating for assessment

Venkataraman again on July 9, 2010.  (R. at 376.)  Dr. Venkataraman noted that
Plaintiff drank alcohol two weeks before at a class reunion and was smoking
marijuana daily.  Dr. Venkataraman indicated that Plaintiff's compliance with her
medication was good, that her behavior was cooperative, that she was alert, and
was able to carry on a goal-oriented reality-based conversation.  (Id.)

On March 24, 2011, Plaintiff met with Preeti Venkataraman, M.D.  Dr.
Venkataraman indicated that Plaintiff was alert and oriented, that her interview
was cooperative, and that her speech was normal, with no evidence of psychosis,
mania, or hypomania.  (R. at 376.)  Plaintiff met with Dr. Preeti Venkataraman
again on April 28, 2011.  Dr. Venkataraman noted that Plaintiff was instructed to
take Xanax three times per day, but that Plaintiff indicated she was taking all three
pills at night.  According to Dr. Venkataraman, Plaintiff reported that her mood
was "somewhat better," and that people noticed that she seemed "less irritable."
(R. at 375.)  Plaintiff also reported that her racing thoughts were significantly
better.  Dr. Venkataraman described Plaintiff's motor activity as normal, and noted
that Plaintiff was alert and oriented and her thought flow was linear, although her
mood was mildly dysphoric.  (Id.)  Dr. Venkataraman recommended that Plaintiff

---

of mental disorders." *Bryce v. Comm'r of Soc. Sec.*, No. 12-CV-14618, 2014 WL
1328277, at *10 (E.D. Mich. Mar. 28, 2014).

continue her current medications and discussed the role of marijuana and her mood.

Plaintiff was admitted to BCA of Detroit Hospital on August 8, 2011 on an involuntary basis due to suicidal ideation.  (R. at 579.)  Plaintiff told hospital staff that she intentionally overdosed on medication two weeks before, by taking 16 tablets of 0.25 milligram Xanax, four tablets of Geodon, Codeine, and Flexeril "all mixed in a cocktail."  (R. at 580 and 589.)  Plaintiff did not seek treatment at that time, but slept for over 20 hours.  She was discharged on August 12, 2011, with a GAF of 50.[2]  (R. at 582.)

Plaintiff completed a Function Report on August 16, 2011.  (R. at 342-349.) In her report, she described waking up between 5:00 a.m. and 8:00 a.m., making coffee, changing her son's diaper and making him breakfast, crying and smoking cigarettes, playing with her son, making lunch, watching television, looking for jobs on the computer, playing computer games, calling friends and family on the phone, making dinner, giving her son a bath, changing her son into pajamas, and going to bed.  (R. at 342.)  She noted that, at the time, her son was three and a half years old.  (R. at 343.)  She also indicated that she had "running thoughts" that kept her awake if she did not take her medication, and that she was "sometimes too

---

[2] A GAF score of 41-50 was indicative of serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

depressed" to address her personal care. (R. at 343.) Plaintiff reported that she cooked, cleaned, did dishes, did laundry, took the garbage out, went shopping weekly, and was able to pay bills, count change, and use a checkbook. (R. at 343-45.) Plaintiff described her hobbies as "watching TV, surf[ing the] internet, us[ing] Facebook, karaoke singing, [and] theatre arts," but indicated that she did not participate in plays anymore because of stress. (R. at 346.) She watched television and chatted on Facebook every day, however, and went to karaoke every other month. Plaintiff described her difficulties in getting along with other people, including "violent outbursts" caused by stress. (R. at 347-48.) On August 17, 2011, Plaintiff presented for psychiatric evaluation at Abaris Behavioral Health. (R. at 604-610.) She was described as having poor concentration, periods of depression, and poor sleep. (R. at 604.) Plaintiff described her aggressive and violent behavior, beginning in elementary school and indicated that she saw a psychiatrist at ages 16-17. (Id.) She was fully oriented to person, time, place, and date, and had no memory problems. Her perception was normal, but her thought process was described as "circumstantial" and "loose." (R. at 606.) She was assessed with a GAF of 45. (R. at 607.)

On November 1, 2011, Plaintiff's records were reviewed by State Agency reviewer, David L. Biscardi, Ph.D. (R. at 149-165.) Dr. Biscardi opined that Plaintiff:

retaine[ed] the capacity to remember, carry out and sustain performance of 1-3 step tasks (but would become overwhelmed if the procedures were more complication), complete a normal workday, interact briefly/superficially with coworkers/supervisors and adapt to changes/stressors associated with simple routine work.

(R. at 164-65.)

On January 26, 2012, Plaintiff was admitted to Havenwyck Hospital with suicidal ideation. (R. at 763.) She had made "superficial cuts to her wrist" and posted a suicide note on Facebook, but indicated that this was a joke. (R. at 763.) People took it seriously, however, and sent a police officer to her home for a welfare check. (R. at 766.) She was discharged on February 6, 2012, with a note that she was calmer and sleeping fairly well. (Id.)

Plaintiff was admitted to the Brighton Center for Recovery on June 3, 2012, due to benzodiazepine/sedative and marijuana dependence. (R. at 689.) She detoxed under medical monitoring until June 15, 2012, when she was discharged as stable to a halfway house. (R. at 680.)

Following her detoxification, Plaintiff presented to LifeWays Community Mental Health for psychiatric evaluation on July 26, 2012, with symptoms of depression, anxiety, and agitation. (R. at 797 and 816.) According to Kevin Studley, L.L.P.C, Plaintiff "articulated clearly and stayed on topic," but her speech was rapid at times. (R. at 816.) She was seen again on July 31, 2012. (R. at 631.) Plaintiff reported that her sobriety improved her mood stability, and that she

currently had normal mood fluctuations but without hopelessness, worthlessness, and frequent sadness.  (Id.)  Plaintiff noted that she did "not want to die if she can get better" and that she wanted to be a good parent to her son.  (Id.) She denied any significant side effects of her medication.  She was seen again on September 27, 2012.  (R. at 639.)  At that appointment, she reported that she was nearly four months sober and that she was going to be a speaker at an Alcoholics Anonymous conference.  (Id.)  Plaintiff reported that she was feeling anxious and wanted to hurt herself, but had not done anything.

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff was born on February 1, 1978 and was 34 years old at the time of the January 8, 2013 administrative hearing.  (R. at 99.)  She has a Bachelor's of Science degree in communications and theater arts from Eastern Michigan University and "used to enjoy drama and singing."  (R. at 103.)  According to Plaintiff, she was able to complete her degree because  "It's drama" and "not real school."  (R. at 144.)  "All you do is act."  (Id.)

The ALJ explored Plaintiff's job history.  Plaintiff testified that she recently worked part-time and on a contract basis for Measurement Incorporated, where she scored standardized tests.  (R. at 106-107.)  However, Plaintiff stopped working for Measurement Incorporated in 2012 when she had a panic attack.  (Id.)  In 1999,

she worked at Victoria's Secret part-time for six months during college. (R. at 113.) In 2000, she worked in infant daycare at the Jewish Community Center of Greater Ann Arbor. (Id.) She left the position after having carpal tunnel surgery. (R. at 115.) After that, she worked at Borders for about three years, first as department assistant, and then as purchase order manager. (R. at 114.) Plaintiff testified that she left that position because her panic attacks prevented her from doing her work. (R. at 115.) Plaintiff also worked at Stony Creek Preschool as a director, assistant director, and preschool teacher. She quit the job after eight weeks because she did not "like their protocols or their procedures." (R. at 115-16.)Plaintiff mentioned that she worked at one other daycare after her position at the Jewish Community Center. (R. at 116.) Likewise, she quit a job at a daycare facility in North Carolina after only six weeks because she "didn't like the procedures" there either. (Id.) In 2007, Plaintiff worked part-time at Merck M, which was an over-the-counter pharmaceutical distributor. (R. at 117.) Her job involved running an electronically based store. (R. at 119.)

Plaintiff averred that, since her alleged onset date, she had also filed for unemployment compensation, which required her to affirmatively answer that she was ready, willing, and able to work. (R. at 105.) On questioning from the ALJ, Plaintiff said that she thought she was ready to work, but that every time she worked she had been institutionalized. (R. at 105-106.)

9

Over the past five years, Plaintiff has been involuntarily committed twice, and she had a voluntary long-term commitment in 2000.  (R. at 131.)  Plaintiff describes a six-week period in 2008 during which she suffered from severe depression and suicidal ideation, and spent 14 to 16 hours crying every day.  (R. at 133.)  She was then involuntarily committed at St. John's Providence for one and a half weeks.  (Id.)

Plaintiff first attempted suicide in August 2011, when she took "copious amounts" of psychotropic drugs and Xanax, and voluntarily admitted herself to the hospital.  (R. at 132.)  Plaintiff testified that she again attempted suicide in February 2012 by taking 40 to 50 pills, drinking a large amount of alcohol, and cutting her arm with a box cutter.  (R. at 130.)  She posted a status about her attempt on Facebook, prompting her brother-in-law to send the police to her home.  (Id.)  She was admitted to Havenwyck[3] for twelve days.  (R. at 131.)  When she was released from Havenwyck, she continued abusing marijuana, alcohol, and Xanax, until entering Brighton.[4]

Following her time at Brighton, Plaintiff testified that she was "a little bit better . . . but then everything just went bad again."  (R. at 132.)  Plaintiff indicated that she still thought about suicide daily.  (R. at 142.)  She described problems with

---

[3] Plaintiff refers to the Havenwycyk Hospital.  (*See* R. at 763.)

[4] Plaintiff refers to the SJH Brighton Center for Recovery.  (*See* R. at 680.)

violence, including threats to kill her parents, her parents' subsequent violence against her, threatening cashiers, and getting in fights with girls in high-school, including an attempt to choke her attorney's daughter. (R. at 135, 139, and 144.) Plaintiff testified that she stopped attending Aware Domestic Assault and Alcoholics Anonymous meetings because she could not get along with either group. (R. at 136.) She also testified to odd behavior, such as showing up at her attorney's office the day before the hearing in her pajamas, not washing her hair, and only showering every week to two weeks. (R. at 139.) Plaintiff admitted that she had gained weight since her time at Brighton, going from 280 to her current weight of 311. (R. at 139-140.) Plaintiff indicated that she sometimes liked being in the hospital because she was able to craft and journal. (R. at 146.)

Plaintiff also testified to problems with rheumatoid arthritis and carpal tunnel. (R. at 141.) She testified that she only slept four hours per night due to the pain in her hands and that she would cycle between "having absolutely no energy to spontaneous bursts of increased energy, hyperactivity." (R. at 140-141.) She indicated it was hard to think coherently and maintain a train of thought.[5] (Id.) Finally, Plaintiff noted that she could not pour coffee, comb her hair, or open door knobs because of the pain in her hands. (R. at 146.)

---

[5] The ALJ, however, pointed out that she had been "right on task in every question" throughout the hearing, but conceded that Plaintiff did seem to want to expand on her answers. (R. at 141-42.)

11

Plaintiff married her husband in 2005 and had one child.  (R. at 100.)  At the time of the hearing, Plaintiff indicated that she was in the middle of a divorce.  (R. at 99.)  She averred that her husband filed for divorce the day she was released from the hospital following her February 2012 suicide attempt.  (Id.)  She further noted that he "kicked [her] out," of their shared apartment and that she was living with her parents and younger brother at the time of the hearing.  (R. at 100.)  Plaintiff testified that she tries to help at her parents' house by putting away dishes, taking care of the cats, keeping her room clean, and helping with groceries.  (R. at 103.)  Plaintiff testified that she had joint supervised custody of her son.  (R. at 101 and 121.)  She indicated that the custody is supervised by her parents because of her instability.  (R. at 122.)  Plaintiff also mentioned a child protective services case that was opened against her and her soon-to-be ex-husband, who told CPS that Plaintiff was abusing drugs and had attempted suicide.  (Id.)  Plaintiff testified that she was sexually abused when she was two years old, and that she suffers from flashbacks of the event.  (R. at 119-120.)

Plaintiff took Xanax for her panic attacks, but began abusing the drug, along with marijuana and alcohol.  (R. at 109.)  She stopped using all three on June 3, 2012, when she entered the Brighton Center for Recovery.  (R. at 110.)  Plaintiff testified that in April 2011 her doctor warned her that using marijuana would negatively affect her mood, but noted that, despite quitting, her life was still very

difficult.  (R. at 120-21.)  She further indicated that she wanted to kill herself every day and struggled with manic episodes.  (R. at 123.)  When the ALJ asked about Plaintiff's statements that she had *no issues with her functional domains*, i.e., no issues with "independence in home living, community living, learning, employment, health and safety, social, protection, and advocacy, medical and behavior," Plaintiff replied, "If I did, it's all lies, because I sure didn't mean it." (R. at 124 and 803-804.)  When asked why she would lie to an agency that was intending to help her, she answered, "Because I wanted them to think I'm okay. I always do that with therapists." (Id.).

## 2.    Vocational Expert Testimony

Janie Massey testified as the Vocational Expert ("VE") at the March 6, 2013 administrative hearing.  (R. at 25-130 and 147.)  The VE classified Plaintiff's past relevant work as: invoice control clerk, with a specific vocational preparation ("SVP")[6] of 4, semi-skilled, and sedentary; administrative clerk, with an SVP of 4, semi-skilled, in the light exertional category but sedentary as performed; order clerk, with an SVP of 4, semi-skilled, with an exertional level of sedentary; and nursery school attendant, with an SVP of 4, semiskilled, with an exertional level of

---

[6] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  SSR 00-4P.

light but medium as performed. (R. at 163.) The ALJ asked the VE to determine if a hypothetical person of Plaintiff's age, educational background, work experience, with no exertional limits, "but whose work is limited to simple, routine, repetitive tasks, with only occasional changes in the work setting, and only occasional public interaction," could perform her past relevant work. (R. at 127.)

Based on this hypothetical, the VE testified that the hypothetical individual could not perform any of Plaintiff's past relevant work, but could perform other jobs in the national and regional economy. (R. at 127.) The VE identified three such positions at the light, unskilled level: stock clerk and order filler, with 119,000 jobs nationally and 4,700 in the state of Michigan; and inspector tester, sorter, sampler and weigher, with 131,000 jobs nationally and 5,200 in the state; and packers and packagers, with 188,000 jobs nationally and 7,500 in the state. (R. at 127.) The VE further testified that the above positions fall "within a frequent manipulation of hands," and the ability to do the work less frequently could impact employability. (R. at 128.)

Upon questioning from Plaintiff's counsel, the VE testified that more than two absences per month and less than 85% on task per day would be work preclusive. (R. at 129.) He further noted that anything that would interfere with the ability to remain on task 85% of the time, including threatening or aggressive behavior, would be work preclusive. (R. at 147.)

## D.  THE ADMINISTRATIVE DECISION

On February 26, 2013, the ALJ issued his decision.  (R. at 81-90.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since January 1, 2008.  (R. at 83.)

At step two, the ALJ found that Plaintiff had the following severe impairments: substance abuse disorder (marijuana, Xanax, and alcohol); affective disorder; and anxiety disorder.  (Id.)  He found that her impairments of obesity, gastro-esophageal reflux disease, irritable bowel syndrome, mild right side carpal tunnel, degenerative disc disease, migraine headaches, and asthma were non-severe.  (R. at 83-84.)

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 84.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[3] and determined that Plaintiff had the capacity to perform:

> a full range of work at all exertional levels but with the following nonexertional limitations: claimant is limited to simple, routine, and repetitive tasks, with only occasional changes in the work setting, and only occasional public interaction.

(R. at 86.)  Relying on the VE's testimony, the ALJ determined that Plaintiff was unable to perform her past relevant work.  (R. at 89.)

At step five, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy.  (R. at 89-90.) He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 90.)

### E.  STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case

---

[3] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from

[the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### F.  ANALYSIS

In her motion for summary judgment, Plaintiff asserts <u>only one statement of error</u>: that the ALJ failed to articulate valid reasons for discounting her credibility.[7]

---

[7] Plaintiff also mentions that the ALJ's opinion was not supported by substantial evidence because he "did not have the opportunity to evaluate the exhibit submitted to the Appeals Council."  (DE 11 at 11.)  Plaintiff does not develop this argument further and does not seek a remand under Sentence Six of § 405(g).  To the extent Plaintiff challenges the ALJ's opinion on the basis of new evidence, the Court is unable to consider documents supplemented at the Appeals Council stage where the Appeals Council declines review for the purposes of remand under

18

Specifically, she takes issue with the ALJ's stated reasons for discounting her credibility, including her testimony that she likes to be in the hospital, is able to function at a high level, has a normal level of daily activity and social interaction, and has little difficulty following instructions.  Plaintiff contends that the bulk of the ALJ's reasoning involves only "sporadic daily functions," which do not take into account the full impact of her bipolar disorder on her ability to work.  (DE 11 at 14.)

The Commissioner opposes Plaintiff's motion, asserting that she is entitled to a grant of summary judgment because substantial evidence supports the ALJ's conclusions.  Specifically, she argues that the ALJ properly weighed the credibility of Plaintiff's subjective statements by citing to specific examples from the record of Plaintiff's testimony, daily activities, and mild issues with concentration.  The Commissioner also points to the ALJ's reliance on the opinion of State Agency reviewer Dr. David Biscardi, whose opinion was consistent with the RFC.  I agree with the Commissioner and will address each point below.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's

---

Sentence Four.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (concluding that "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.").  Accordingly, I will not consider such an argument, if Plaintiff intended to make one.

demeanor." *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008).

Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported

by substantial evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th

Cir. 1997). "Discounting credibility to a certain degree is appropriate where an

ALJ finds contradictions among the medical reports, claimant's testimony, and

other evidence." *Walters,* 127 F.3d at 531. When assessing an individual's

credibility, "the ALJ must [first] determine whether a claimant has a medically

determinable physical or mental impairment that can reasonably be expected to

produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370,

371 (6th Cir. 2011). The ALJ made this finding here, concluding that Plaintiff's

medically determinable impairments could reasonably be expected to cause the

alleged symptoms. (R. at 86-87.)

Upon making such a finding, the ALJ must next "consider the entire case

record" to "evaluate the intensity, persistence, and functional limitations of the

symptoms considering objective medical evidence." 20 C.F.R. § 404.1529(c)(1-

3); Soc. Sec. Rul. 96-7p. A non-exhaustive list of relevant factors to be considered

by the ALJ include: 1) the claimant's daily activities; 2) location, duration,

frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) the

type, dosage, effectiveness, and side effects of medication; 5) treatment, other than

medication; 6) any measures the claimant uses or has used to relieve his or her pain

or other symptoms; and 7) other factors concerning functional limitations and
restrictions. *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014);
20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p; *see also Ewing v. Astrue*, No.
10-cv-1792, 2011 WL 3843692, at *9 (N.D. Ohio, Aug 12, 2011) ("Social Security
Ruling 96-7p requires such factors to be *considered*, not *discussed* . . . .")
(emphasis in original) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496,
508 (6th Cir. 2006)).  In his or her opinion, the ALJ must "provide a sufficiently
specific explanation for his [or her] credibility determination so that it is clear to
the individual and any subsequent reviewers the weight given to the individual's
statements and the reasons for that weight." *Malcolm v. Comm'r of Soc. Sec.*, No.
13-15188, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (citing *Soc. Sec.
Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1997)).

Here, the ALJ provided a sufficiently specific explanation for his credibility
determination, pursuant to the rule.  As Plaintiff describes, the ALJ discussed
Plaintiff's testimony that she "likes to be in the hospital because she feels safe
there and she gets to do crafts and write in her journals."  (R. at 88 and 146.)
Plaintiff contends that this consideration was in error because two of Plaintiff's
hospital commitments were involuntary.  However, the ALJ also outlined
Plaintiff's psychiatric history in detail, including the fact that Plaintiff had been
admitted to the hospital several times because of her psychiatric problems,

demonstrating that he considered Plaintiff's voluntary and involuntary hospital admissions.  (R. at 87.)  Furthermore, the ALJ relied on far more than this one fact to support his conclusions.  He pointed to evidence in the record that Plaintiff had a linear thought flow, good hygiene, good recent and remote memory (R. at 87), the impact of sobriety on Plaintiff's mood, and the opinion of State Agency reviewer Dr. Biscardi (R. at 88).  Moreover, he noted that Plaintiff "described herself as 'dramatic'" to medical personnel, in light of her background in theater (R. at 87, 713) and further noted that in a face-to-face interview with a Social Security interviewer was observed to have some difficulty in concentration, but no difficulty with hearing, reading, breathing, understanding, coherency, talking, answering, sitting, standing, walking, seeing, using her hands or writing. (R. at 88, 296).[8]

Second, the ALJ did not err in addressing Plaintiff's activities of daily living, including her ability to do household chores, go shopping weekly, drive, prepare meals, pay bills, count change, use a checkbook, watch television, use a home computer to chat on Facebook, talk to her friends on the phone, and sometimes go to karaoke, as reasons discount her credibility.  Such a consideration of Plaintiff's activities of daily living was not itself in error. *See Heston v. Comm'r*

___

[8] Additionally, the interviewer observed that Plaintiff "mentioned that she is separated from her husband and every so often she was blaming him for her issues," indicating that at least some of Plaintiff's complaints were situational.  (R. at 296.)

*of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (concluding that the ALJ properly determined that the claimant's "subjective complaints were not credible in light of her ability to perform other tasks" including walking around her yard, riding a bicycle, going to church, going on vacation, cooking, vacuuming, and making beds).

Furthermore, the ALJ expressly stated that he complied with Social Security Rule 96-7p, which requires him to consider a non-exhaustive list of factors in determining credibility. (R. at 125.) There is no indication that he failed to do so. *See, e.g.*, *Malcolm*, 2015 WL 1439711 at *8 (concluding that, in light of the Court's deferential approach to credibility assessments, the ALJ's express statement of compliance was persuasive). Social Security Rule 96-7p, in accordance with 20 C.F.R. § 404.1529, requires the ALJ to consider the claimant's activities of daily living. As addressed above, the ALJ did just that, and included such consideration in her credibility determination. He certainly cannot be *faulted* for complying with the regulation.

Additionally, as noted above, Plaintiff's activities of daily living are not the ALJ's only rationale for discounting Plaintiff's allegations of work-preclusive limitations. *See Boley v. Comm'r of Soc. Sec.*, No.. 11-cv-15707, 2012 WL 7748910, at *13 (E.D. Mich. Nov. 28, 2012) *report and recommendation adopted*, No. 11-CV-15707, 2013 WL 1090531 (E.D. Mich. Mar. 15, 2013) (concluding

that, while "minimal activities of daily living do not, by themselves, show that a claimant can perform the demands of full-time work," such a consideration *in combination with other relevant factors* was proper to discount Plaintiff's credibility.).  The other relevant factors considered here include objective evidence in the record that Plaintiff had a linear thought flow, good hygiene, good recent and remote memory, that Plaintiff's sobriety improved her mood stability, and the opinion of Dr. Biscardi, who opined that Plaintiff could complete a normal workday, interact briefly with co-workers and supervisors, and could adapt to changes associated with simple, routine work. (R. at 88 and 159-165.)  The ALJ gave great weight to Dr. Biscardi's opinion, and accordingly limited Plaintiff to simple, routine, and repetitive tasks with only occasional changes in work setting and only occasional public interaction.  The ALJ therefore provided a sufficiently specific explanation for her credibility determination and Plaintiff has failed to demonstrate that the adverse-credibility finding was not supported by substantial evidence.

In contrast, although Plaintiff asserts that the ALJ's reasons for discounting Plaintiff's credibility were not supported by substantial evidence, she does not point to any evidence in the record (other than her own testimony) which she believes demonstrates that the ALJ erred in his credibility assessment.  The ALJ's reliance on an accurate portrayal of this portion of Plaintiff's testimony was not in

24

error.  It is also worth observing, although perhaps not considered by the ALJ, that Plaintiff herself admitted on the witness stand that she always lies to therapists and that when she told the intake evaluator at Lifeways in July 2012 that she had no issues with any of her functional domains, it was "all lies, because I sure didn't mean that."  (R. at 124 and 803-804.)  It is hard to imagine how her admitted fabrications, retractions and "dramatic" persona would not legitimately impede her credibility. In light of the reliance placed by Plaintiff on her own testimony here, the ALJ can hardly be faulted for giving it little weight and reaching the conclusion that she is not disabled from work as defined by the Act.

## G.   CONCLUSION

Plaintiff's testimony and medical records portray a sad life story. I am neither unaware nor unsympathetic to the tragic series of events she claims to have endured, going all the way back to the time when she was a toddler. I have little doubt from her testimony, as corroborated by medical records, that she suffers from certain psychological or psychiatric impediments. However, I am also aware of the fact that this case, to a large extent, hinges on her credibility, and of the need to give deference to the ALJ before whom she testified personally. He was in a significantly better position to weigh her demeanor and candor while she was testifying before him than I am. Having read the entire transcript of that hearing, in conjunction with the ALJ's written opinion, it is more than apparent that he found

25

her to be lacking in credibility and that this played a permissible and justifiable role in his findings. The standard of review is deferential and gives "great weight and deference [to the ALJ's credibility assessment], since he had the opportunity to observe the witness's demeanor." *Infantado,* 263 F. App'x at 475 . Since his assessment of this claimant's credibility is supported by substantial evidence, as required by *Walters*, *supra.,* 127 F.3d at 531, I see no reason that this matter should be reversed or remanded.

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment, **GRANT** Defendant's motion for summary judgment, and **AFFIRM** the Commissioner of Social Security's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: June 30, 2015                        s/Anthony P. Patti
                                            Anthony P. Patti
                                            UNITED STATES MAGISTRATE JUDGE